Dear Mayor Johnson:
You have asked this office to issue an opinion regarding the potential liability of the City of Harahan where honorary police commissions are issued by the chief of police.
The City of Harahan is a Lawrason Act municipality, governed by the provisions of R.S. 33:321, et seq. The City of Harahan also has an elected chief of police who is statutorily authorized to appoint and discharge police personnel. R.S. 33:423.2 provides:
 § 423.2. City of Harahan; appointment and discharge of police personnel by chief of police
 Notwithstanding the provisions of R.S. 33:402(4) or R.S. 33:423 or any other provision of law to the contrary, in and for the city of Harahan, the chief of police shall appoint and discharge police personnel subject to the budgetary limitations of the mayor and board of aldermen pertaining to the number of allotted positions for the police department.
The language of R.S. 33:423.2 is unambiguous. The chief of police of the City of Harahan has the ability to hire and fire police personnel, subject only to the budgetary limitations of the mayor and board of aldermen regarding the number of positions in the police department.
Attendant to this authority is the ability of the chief of police to issue honorary commissions to those individuals not actually hired by the police department. This office has recognized that other chiefs of police who are not authorized to hire and fire nonetheless have the authority to issue honorary commissions as an act in the day-to-day operation of the police department which does not need the approval of the mayor and board of aldermen. See Attorney General Opinion 03-0016, copy attached. An individual who has an honorary commission from the chief of police does not have any law enforcement authority, no police department duties, and cannot be considered as police personnel. See Attorney General Opinion 00-159, copy attached.
Further, in Attorney General Opinion 95-143, this office found no statutory definition of the phrase "commission card" and no specific authority for the issuance of such a card. "Thus, the card itself cannot bestow arrest authority upon a person who has not otherwise met the requirements of law as a commissioned law enforcement officer. It is axiomatic that a private citizen does not have the same authority as a law enforcement officer." See Attorney General Opinion 95-143, copy attached.
Thus, an individual issued an honorary commission who has not otherwise met the requirements of law as a commissioned law enforcement officer and who is not hired by the police department as an employee cannot act as an agent of the municipality. While each case must be decided upon its own particular facts, it is a fair assessment that no liability could attach to the municipality for the actions of this individual.
This office has many times recognized that an honorary commission issued by law enforcement is permissible and does not convey actual law enforcement authority upon the individual receiving the commission. See Attorney General Opinion 03-0308 (an elected school board member may receive an honorary commission as a deputy sheriff) and Attorney General Opinion 95-0169 (treasurer of the police jury may receive an honorary commission as deputy sheriff).
However, the issuance of a police department badge by a chief of police to someone who is not a law enforcement officer is not authorized by law. In Attorney General Opinion 03-16, this office found no authority for the issuance of a police department badge to a person who is not hired as a policeman. An individual carrying an unauthorized badge could be charged with false personation of a peace office under R.S. 14:112.1, providing:
§ 112.1 False personation of a peace officer
False personation of a peace officer is the performance of any one or more of the following acts with the intent to injure or defraud or to obtain or secure any special privilege or advantage:
Impersonating any peace officer or assuming without authority, any uniform or badge by which a peace officer is lawfully distinguished.
Performing any act purporting to be official in such assumed character.
Making, altering, possession, or use of a false document or document containing false statements which purports to be a training program certificate or in-service training certificate or other documentation issued by the Council on Peace Officer Standards and Training, pursuant to R.S. 40:2405, which certifies the peace officer has successfully completed the requirements necessary to exercise his authority as a peace officer.
Whoever commits the crime of false personation of a peace officer shall be fined not more than one thousand dollars or imprisoned with or without hard labor for not more than two years, or both.
Liability of the municipality for the acts of an individual possessing such a badge again would be determined on the particular facts of the case. Our research reflects two cases (copies attached) which may prove of interest to you. In Tezenovs. Maryland Casualty Company, 166 So.2d 351 (La.App. 3rd Cir. 1964), the court determined that a theater employee who shot a patron was not a "policeman" for the city, notwithstanding that the employee was wearing a policeman's uniform and that he held an honorary commission from the police department. Further, inJoiner vs. Lenee, 213 So.2d 136 (La.App. 3rd. Cir. 1968), the city could not be held liable for the actions of a night club bouncer not employed by the city at the time he shot and killed a club patron, notwithstanding that he wore a city police badge and police uniform.
Finally, the municipality is liable for the actions of a special deputy appointed by the chief of police who does not receive a salary but performs as a reserve or auxiliary officer. A reserve or auxiliary officer has the same authority as an ordinary peace officer, and those who have completed training may carry concealed firearms when "in the actual discharge of official duties subject to the regulations of the law enforcement agencies with which they are affiliated." See Attorney General Opinions 00-0159, 95-0143 and 93-0826, copies attached.
Very truly yours,
 CHARLES C. FOTI, JR. ATTORNEY GENERAL
BY: _____________________________________
 KERRY L. KILPATRICK ASSISTANT ATTORNEY GENERAL
KLK:ams
OPINION NUMBER 03-16 Mayor Rodney Jordan Attorney General of Louisiana — Opinion June 20, 2003
60 — Law Officers — Authority Jurisdiction R.S. 14:112
R.S. 122.2
The Mayor, having no authority to issue an individual a police department badge who has not been hired as a police officer, the individual using the badge may be in violation of false personation. The mayor may issue an honorary commission without approval of the Board of Aldermen.
Mayor Rodney Jordan Village of Florien P.O. Box 68 Florien, LA 71429
RICHARD P. IEYOUB
Dear Mayor Jordan:
This office is in receipt of your request for an opinion of the Attorney General in regard to issuance of a police department badge to someone who is not an officer. You ask whether a Chief of Police in a Lawrason Act community can issue a badge and authorize the displaying of that badge by a person who has not been hired or considered for hiring as a policeman by the Mayor and Board of Aldermen.
We find no authority for the issuance of a police department badge to a person who is not hired as a policeman for the Village, and as observed by this office in Atty. Gen. Op. 89-159, "A Justice of the Peace is a judicial officer. He is not entitled incidental to that office to act as a law enforcement officer. Accordingly, the carrying of a badge is prohibited by R.S. 14:112 (False Personation)."
The latter statute provides that false personation is performance of an act with intent to defraud by "impersonating any public officer, * * * having special authority by law to perform an act affecting the rights or interests of another, or assuming, without authority, of any uniform orbadge by which such officer or person is lawfully distinguished". (Emphasis added.)
Similarly, R.S. 14:122.2, false personation of a peace officer, sets forth that false personation of a peace officer with the intent of defraud includes "impersonating any peace officer or assuming, without authority, any uniform or badge by which a peace officer is lawfully distinguished".
Moreover, while this office has repeatedly recognized that the police chief has no authority to hire and fire police personnel, he does make recommendations to the mayor and board of aldermen for appointments, disciplinary action, and dismissals of police officers.
However, an individual who has an honorary commission from the Chief of Police does not have any law enforcement authority, no police department duties, and cannot be considered as police personnel and does not need the approval of the Board of Aldermen for the commission from the Chief of Police inasmuch as the elected chief of police is the final authority in the day-to-day operation of his office. Therefore, the issuance of the commission is an act in the day-to-day operation of the police department which does not need approval of the Board of Aldermen.
Therefore, if the individual in question has a police department badge which the Chief of Police has no authority to issue, the individual could be violating the criminal statute of false personation of an officer which carries a penalty of not more than one thousand dollars or imprisoned with or without hard labor for not more than two years, or both. R.S. 14:112 defines false personation as including the assuming without authority of any badge by which a officer is distinguished with intent to defraud, and R.S. 14:112.1 also covers false personation of any peace officer or assuming without authority any badge by which a peace office is lawfully distinguished with intent to injure, defraud or secure any special privilege or advantage.
Accordingly, we hope this sufficiently answers your inquiry, but if we can be of further assistance, do not hesitate to contact us.
Very truly yours,
 RICHARD P. IEYOUB ATTORNEY GENERAL
 BY: __________________________ BARBARA B. RUTLEDGE Assistant Attorney General
RPI/bbr
Date Released: June 20, 2003
OPINION NUMBER 95-143
Major Frank E. Landry Attorney General of Louisiana — Opinion JUNE 22, 1995
60 LAW OFFICERS — Authority Jurisdiction 71 MUNICIPALITIES 47A FIREARMS FIREWORKS 77 OFFICERS — Local Municipal LSA-Const. Art. 6, Section 9(B) (La. 1974); LSA-C.Cr.P. Art. 213; LSA-R.S. 33:2201(10); LSA-C.Cr.P. Art. 214; LSA-R.S. 40:1382; LSA-R.S. 14:95(G); LSA-R.S. 17:1805; LSA-R.S. 40:1379.1, LSA-R.S.40:1379.2, and LSA-R.S. 40:1379.3
A private citizen in physical possession of a "commission card" may not execute police authority if he has not met certification requirements of law.
Major Frank E. Landry Lake Charles Police Department 830 Enterprise Boulevard P.O. Box 1564 Lake Charles, LA 70602-1564
RICHARD P. IEYOUB
Dear Major Landry:
This office is in receipt of your opinion request concerning the authority extended private citizens by virtue of the issuance of "commission cards" by local law enforcement agencies.
We find no statutory definition of the phrase "commission card" and no specific authority for the issuance of such a card. Thus, the card itself cannot bestow arrest authority upon a person who has not otherwise met the requirements of law as a commissioned law enforcement officer.
It is axiomatic that a private citizen does not have the same authority as a law enforcement officer. In Louisiana, the term "law enforcement officer" is synonymous with "peace officer" which is defined under LSA-R.S. 40:2402 (1)(a) as follows:
 (1)(a) "Peace officer" means any full-time employee of the state, a municipality, a sheriff, or other public agency, whose permanent duties actually include the making of arrests, the performing of searches and seizures, of the execution of criminal warrants, and is responsible for the prevention or detection of crime or for the enforcement of the penal, traffic, or highway laws of this state, but not including any elected or appointed head of a law enforcement department.
 (b) "Peace officer" shall also include those sheriff's deputies whose duties include the care, custody, and control of inmates.
Further, a peace officer must meet certification requirements in order to exercise his authority as provided in LSA-R.S.40:2405(A):
 A. Notwithstanding any other provisions of law to the contrary, any person who begins employment as a peace officer in Louisiana subsequent to January 1, 1986, must successfully complete a certified training program approved by the council and successfully pass a council-approved comprehensive examination within one calendar year from the date of initial employment. Failure to comply with this requirement will be grounds for the council to seek an injunction prohibiting such an individual from exercising the authority of a peace officer. (Emphasis Added).
Concerning the powers of arrest, note that a peace officer may, without a warrant, arrest a person in certain instances, pursuant to LSA-C.Cr.P. Art. 213, providing:
Art. 213. Arrest by officer without warrant; when lawful
 A peace officer may, without a warrant, arrest a person when:
 (1) The person to be arrested has committed an offense in his presence; and if the arrest is for a misdemeanor, it must be made immediately or on close pursuit;
 (2) The person to be arrested has committed a felony, although not in the presence of the officer;
 (3) The peace officer has reasonable cause to believe that the person to be arrested has committed an offense, although not in the presence of the officer; or
 (4) The peace officer has received positive and reliable information that another peace officer from this state holds an arrest warrant, or a peace officer of another state or the United States holds an arrest warrant for a felony offense.
 A peace officer in close pursuit of a person to be arrested, who is making an arrest pursuant to this Article may enter another jurisdiction in this state and make the arrest.
In contrast, an auxiliary police officer has the same authority as an ordinary peace officer, only while functioning as an agency's representative. LSA-R.S. 33:2201(10) provides, in pertinent part:
 (10) . . . . . . a reserve or auxiliary law enforcement officer shall be defined as a volunteer, non-regular, sworn member of a law enforcement agency who serves with or without compensation and has regular police powers while functioning as an agency's representative, and who participates on a regular basis in agency activities including, but not limited to those pertaining to crime prevention or control, and the preservation of the peace and enforcement of the law. (Emphasis added).
In further contrast, a private citizen has limited arrest powers as indicated in LSA-C.Cr.P. Art. 214:
Art. 214. Arrest by private person; when lawful
 A private person may make an arrest when the person arrested has committed a felony, whether in or out of his presence.
Regarding concealed firearms, note that a person vested with police power may carry a concealed weapon in the following instance:
 The provisions of this section except paragraph 4 of sub-section A shall not apply to sheriffs and their deputies, state and city police, constables and town marshals, or persons vested with police power when in the actual discharge of official duties or, if not actually discharging official duties, when such sheriffs and their deputies and state and city police are full-time, active, and certified by the Council on Peace Officer Standards and Training and have on their persons valid identification as duly commissioned law enforcement officers. See LSA-R.S. 14:95(G).
The courts have recognized the wide latitude given to police departments, sheriff's offices, and other law enforcement agencies in making their own reasonable regulations, including the carrying of firearms and ammunition by police officers while on and off duty. Lally v. Department of Police,306 So.2d 65 (4th Cir. 1974). State statutes regulate the possession of firearms by state police officers, agents, or employees (LSA-R.S.40:1382) and by university and college police officers (LSA-R.S. 17:1805). Further in this regard, note that this office has consistently been of the opinion that part-time and auxiliary law enforcement officers, who have completed training as peace officers, may carry concealed firearms only when "in actual discharge of official duties" subject to the regulations of the law enforcement agencies with which they are affiliated. See Opinions 79-1212, 93-785, 93-826. Note also that individuals may be issued a concealed handgun permit in limited instances, as contemplated by LSA-R.S. 40:1379.1, LSA-R.S. 40:1379.2, and LSA-R.S.40:1379.3. Because of the length of these statutes, we do not requote them in entirety here, but enclose copies of the law for your further review.
The statutory authority quoted above clearly dictates that an individual must meet certification requirements within a certain time in order to be vested with police power. An individual who is not a sheriff, deputy sheriff, state or city police officer, constable, town marshal, or auxiliary law enforcement officer functioning as a law enforcement agency's agent, does not have police authority, notwithstanding the fact that a commission card may have been issued to him which purports to convey such authority.
Therefore, it is the opinion of this office that there is no statutory authority for a law enforcement agency to issue "commission cards" to any individual and thereby vest that person with either arrest powers or authority to carry concealed weapons.
Very truly yours,
 RICHARD P. IEYOUB ATTORNEY GENERAL
 BY: ___________________________ KERRY L. KILPATRICK ASSISTANT ATTORNEY GENERAL
KLK:ams
OPINION NUMBER 00-159
Mr. Kenny P. Poche Attorney General of Louisiana — Opinion June 13, 2000
60 — Law Officers 77 — Officers R.S. 33:2201
The issuance by the Chief of Police of a commission as an honorary gesture does not need approval of the Board of Aldermen, but for an uncompensated reserve officer you must have approval.
Mr. Kenny P. Poche Chief of Police Town of Gramercy 120 North Montz Ave. Gramercy, La. 70052
RICHARD P. IEYOUB
Dear Chief Poche:
This office is in receipt of your request for an opinion of the Attorney General in regard to issuance of a Special Commission as Deputy by the Chief of Police. You ask whether the elected Chief of Police can issue a Special Commission without the approval of the Board of Alderman to appoint someone as a Special Deputy who would not receive a salary.
Pursuant to our telephone conversation we have been informed that you are interested in both an honorary commission for an individual who will have no law enforcement powers as well as a special deputy who is trained and has law enforcement power.
This office has recognized that reserve or auxiliary officers have the same authority as an ordinary peace officer, and those who have completed training may carry concealed firearms when "in the actual discharge of official duties subject to the regulations of the law enforcement agencies with which they are affiliated." Atty. Gen. Op. Nos. 95-143, 93-826. In Atty. Gen. Op. No. 95-143 the provisions of R.S. 33:2201(10) were quoted as follows:
 (10) . . . . . a reserve or auxiliary law enforcement officer shall be defined as a volunteer, non-regular, sworn member of a law enforcement agency who serves with or without compensation and has regular police powers while functioning as an agency's representative, and who participates on a regular basis in agency activities including, but not limited to those pertaining to crime prevention or control, and the preservation of the peace and enforcement of the law.
Therefore, in regard to an auxiliary law enforcement officer, whether compensated or not, we must conclude the appointment must have the approval of the Board of Aldermen as other police personnel. It is well settled in accordance with R.S. 33:423 that only the board of alderman may hire or fire police personnel upon the recommendation of the elected Chief of Police.
Moreover, it has been noted that a special police officer using unnecessary or excessive force or unlawful use of police powers by a special police officer during the performance of his duty rendered the municipality as employer liable for resulting injuries or damage. Atty. Gen. Op. No. 77-1160.
We find that an individual with an honorary commission is distinguishable from the auxiliary or reserve officer inasmuch as the former does not have any law enforcement authority, no police department duties, and cannot be considered as police personnel.
In Atty. Gen. Op. 95-143 this office responded to a request concerning the authority extended to private citizens by issuance of "commission cards" by local law enforcement agencies. Therein it was observed that there was no statutory definition of the phrase "commission card" and no specific authority for the issuance of such a card. However, it was concluded an individual does not have police authority notwithstanding the fact that a commission card may have been issued to him. A private citizen does not have the same authority as a law enforcement officer.
Consequently, we find that the issuance of a commission card to an individual as an honorary gesture does not need the approval of the Board of Alderman inasmuch as the elected chief of police is the final authority in the day-to-day operation of his office and equipment. We do not find that an individual with an honorary commission is an employee of the police department, and the issuance of the commission is an act in the day-to-day operation of the police department which does not need approval by the Board of Aldermen.
We hope this sufficiently answers your inquiry, but if we can be of further assistance, do not hesitate to contact us.
Sincerely yours,
 RICHARD P. IEYOUB Attorney General
 By:__________________________ BARBARA B. RUTLEDGE Assistant Attorney General
RPI/bbr
OPINION NUMBER 93-826 Nick A. Congemi Attorney General of Louisiana — Opinion March 8, 1994
 SYLLABUS
47-A Firearms Fireworks
60 Law Officers — Authority Jurisdiction
107 Sheriffs
La. Const. Art. 5 § 27; R.S. 14:95; R.S. 40:1379.1
Reserve and auxiliary police officers whether full-time or part-time may not carry concealed weapons unless in the actual discharge of official duties as a police officer. P.O.S.T. training is required before a full-time officer may carry a weapon outside the discharge of his official duties. Municipal police department may not issue a concealed handgun permit.
Nick A. Congemi Chief of Police Kenner Police Department 1801 Williams Blvd. Kenner, Louisiana 70062
Dear Chief Congemi:
Your request for an Attorney General's Opinion was forwarded to me for research and reply. You asked the following questions;
 1. Pursuant to La.R.S. 14:95(G), as amended by Act 636 of 1993, may the terms "full-time" and "active" be construed to refer to full-time reserve officers?
 2. May a full-time civilian police department employee, who has completed P.O.S.T. certification and is a commissioned reserve police officer, carry a concealed weapon outside of the discharge of his official duties?
 3. Is the completion of P.O.S.T. training necessary prior to allowing a full-time peace officer to carry a concealed weapon outside of the discharge of his official duties?
 4. If reserve officers cannot carry concealed weapons outside of the discharge of their duties, what authority does a municipal police department have in granting a "concealed handgun permit" other than commissioning such persons.
Your first two questions were recently answered in A.G.O NO. 93-785 which addressed the effects of the amendment of La.R.S.14:95(G) by Act 636 of the 1993 Legislative Session.
Attorney General Opinion Number 93-785 states in part:
 Part-time and auxiliary law enforcement officers are by definition not full-time law enforcement officers. The amendment of La.R.S. 14:95(G) applies only to full-time law enforcement officers. It is the opinion of this office that the authority of the auxiliary or part-time officers to carry concealed weapons is not affected by this amendment. Now as before, part-time and auxiliary law enforcement officers, who have completed training as peace officers, may carry concealed firearms when "in the actual discharge of official duties" subject to the regulations of the law enforcement agencies with which they are affiliated.
Therefore, it is the opinion of this office that Act 636 of the 1993 Legislative session does not affect full-time or part-time reserve or auxiliary police officers. As it was prior to the amendment of La.R.S. 14:95(G), reserve officers, including civilian employees of the police department, may only carry concealed weapons while in the discharge of official duties as law enforcement officers.
As to your third question, La.R.S. 14:95(G) specifically provides that in order for a law enforcement officer to carry a concealed weapon while not in the actual discharge of official duties, the law enforcement officer must be "full-time, active and certifiedby the Council on Peace Officer Standards and Training [P.O.S.T.]
and have on their persons identification as duly commissioned law enforcement officers." (emphasis added).
Your fourth question is answered by La.R.S. 40:1379.1(F) which states: "the chief law enforcement officer of a parish shall have the authority to issue a concealed handgun permit to an individual, which permit shall be valid only within the boundaries of the chief law enforcement officer's parish." Article 5 § 27 of the Louisiana Constitution of 1974 establishes that the Sheriffshall be the chief law enforcement officer in the parish with the exception of Orleans Parish.
Recent court decisions have read the language of the Louisiana Constitution of 1974 literally. "[T]he sheriff is constitutionally and statutorily the chief law enforcement officer of his parish, but his jurisdiction is limited to territorial boundaries of his parish." Hayes v. Parlsem Industrial Services,Inc. 598 So.2d 1194 (La.App. 3 Cir. 1992).
Thus, it is the opinion of this office, that by virtue of his authority as chief law enforcement officer of his parish, a sheriff is the only official who possesses authority to issue concealed handgun permits. A municipal police chief may not issue concealed handgun permits because he is not the chief law enforcement official of his parish.
In summary, it is the opinion of this office that Act 636 of 1993 does not affect reserve or auxiliary police officers when they are in the actual discharge of their official duties. A full-time civilian police department employee who is a reserve police officer with P.O.S.T. training may not carry a concealed weapon when he is not in the actual discharge of his duties as a police officer. Completion of P.O.S.T. training is required before a full-time peace officer may carry a concealed weapon outside of the discharge of his official duties. Finally, a municipal police department may not issue a concealed handgun permit.
I hope this opinion has adequately addressed your questions. If this office can be of further assistance, please do not hesitate to contact us.
Sincerely,
 RICHARD P. IEYOUB Attorney General
BY: __________________________
 FRANK BRINDISI Assistant Attorney General
RPI/FB:ckj
TEZENO v. MARYLAND CASUALTY COMPANY, 166 So.2d 351 (1964) JOSEPH TEZENO, PLAINTIFF AND APPELLANT, v. MARYLAND CASUALTY COMPANY, VINCENT THIBEAUX AND ALBERT ISADORE, DEFENDANTS AND APPELLEES. No. 1173. Court of Appeal of Louisiana, Third Circuit. July 10, 1964.
APPEAL FROM FIFTEENTH JUDICIAL DISTRICT COURT, LAFAYETTE PARISH, STATE OF LOUISIANA, HONORABLE CHARLES T. EVERETT, J. *Page 352 
Domengeaux Wright, by Mark Bienvenu, Lafayette, for plaintiff-appellant.
Mouton, Champagne Colomb, by Welton P. Mouton, Lafayette, for defendant-appellees.
Before FRUGÉ, TATE and HOOD, JJ.
HOOD, Judge.
Plaintiff, Joseph Tezeno, instituted this suit against Albert Isadore, Vincent Thibeaux, and Maryland Casualty Company to recover damages for the death of his son, Ambrose Tezeno, who was shot and killed by Albert Isadore. No answer was filed by Thibeaux and no judgment has been rendered against him. Answers were filed by the remaining defendants, and after trial judgment was rendered (1) in favor of plaintiff and against defendant Isadore for the sum of $5,000.00, and (2) in favor of Maryland Casualty Company dismissing the suit as to that defendant. Plaintiff has appealed, contending that the trial judge erred in dismissing the suit as to Maryland Casualty Company and that the amount of the award should be increased. Defendant Isadore has answered the appeal praying that the judgment condemning him to pay damages be reversed.
The evidence shows that the decedent, Ambrose Tezeno, and his brother went to the Gil Theater in Lafayette, Louisiana, during the afternoon of October 29, 1961. Both purchased tickets, and after entering the theater the decedent became boisterous. Defendant Isadore, who was then employed by the owner of the theater, approached the decedent and asked him to leave. An argument took place between Ambrose and Isadore, but the decedent's brother intervened and pushed the decedent out of the theater. After the parties were outside the theater, the decedent approached Isadore and demanded that the purchase price of his ticket be refunded to him. While decedent was approaching Isadore outside the theater, the latter drew a pistol from a holster which he wore on his person and fired four shots in the direction of the decedent, three of which entered his body killing him almost instantly. Both the decedent and Isadore are members of the Negro race.
At the time this incident occurred Isadore was employed by Vincent Thibeaux, owner of the Gil Theater, to keep order in and around that building. Isadore was wearing a policeman's uniform at the time, and he carried a loaded pistol in a holster at his side.
The first important issue presented is whether Isadore was justified in shooting the decedent under the circumstances presented here, and thus whether he is responsible in damages for Tezeno's death. Defendants contend that the decedent was the aggressor, that it was necessary for Isadore to shoot in self-defense, and that plaintiff for that reason is barred from recovery. Plaintiff contends that decedent was not the aggressor and that the shooting was unprovoked. Alternatively, he argues that even though his son may have been the aggressor defendant Isadore used excessive and unnecessary force in repelling the attack, and that for that reason he is responsible in damages for the death of the decedent.
The trial judge concluded that "Ambrose was making a disturbance and did advance upon Albert Isadore," but that the force *Page 353 
used by defendant Isadore "to repel the invasion was excessive." He found, therefore, that Isadore was responsible in damages for the death of plaintiff's son.
There is a conflict in the testimony of witnesses as to whether the decedent was actually the aggressor. Our review of the evidence satisfies us, however, that the trial court was correct in concluding that the decedent was the aggressor at the time the shots were fired. A few moments prior to that time he had made at least one attempt to strike Isadore with his fists, and at the time the first shot was fired he was advancing toward Isadore in a belligerent manner, using profane language. The evidence also establishes, however, that neither the decedent nor his brother had a weapon of any kind, and there was nothing in the actions of either which we feel could have caused Isadore to think that they were armed. The decedent was intoxicated, and the principal cause of his belligerency at the time of the shooting was that he wanted a refund of the price of his ticket. Prior to the shooting the decedent's brother had been endeavoring to subdue Ambrose, and we find nothing in the evidence which should have caused Isadore to fear an attack by the brother. The shooting occurred outside the building, in the open, and Isadore concedes that he was about 10 feet from the decedent when the first shot was fired. Under these facts it seems to us that Isadore could have resolved the difficulty without the use of a pistol, and we accordingly find no error in the conclusion reached by the trial judge that defendant Isadore used force which was excessive and unnecessary in repelling the attack by the decedent.
In Bethley v. Cochrane, La.App.Orl., 77 So.2d 228 (Cert. denied), the court quoted with approval the following excerpt from 4 Am.Jur., Assault and Battery, Section 51, page 153:
 "`One who, in acting in self-defense, uses force in excess of that which he is privileged to use, is liable for so much of the force used as is excessive, and the other person has the normal privilege of defending himself against the use or attempted use of excessive force. In other words, to the extent that excessive violence and unnecessary force is used in repelling an assault, one becomes liable as trespasser and subject to an action for assault and battery. In determining whether the particular means used is or is not excessive, the amount of force exerted, the means or instrument by which it is applied, the manner or method of applying it, and the circumstances under which it is applied are factors to be considered. Ordinarily, a person is not justified in using a dangerous weapon in self-defense where the attacking party is not armed but commits the battery by means of his fists or in some other manner not essentially dangerous to life or limb. * * *'" (77 So.2d 231, Emphasis added.)
In Edwards v. Great American Insurance Company, La. App. 2 Cir.,146 So.2d 260, the rule was stated as follows:
 "We recognize the correctness of the rule that resort to the use of a dangerous weapon in order to repel a supposed attack upon a defendant's person or upon persons to whom he owes a duty to protect cannot be countenanced as justifiable save in exceptional cases where the actor's fear of the danger is not only genuine but is founded upon facts which would be likely to produce similar emotions in men of reasonable prudence. Patterson v. Kuntz, La. App. Orleans, 1946, 28 So.2d 278." (146 So.2d 262.
The First Circuit Court of Appeal, in allowing a plaintiff to recover for personal injuries in Ford v. Williams, La. App. 1 Cir., 62 So.2d 838, said:
 "* * * However, it is fundamental law that a person can only use reasonable force in repelling an invasion of his person, and it is clear that, even though we were to assume that petitioner *Page 354 
was the aggressor, an unreasonable amount of force was used by defendant and his family in repelling same." (62 So.2d 840).
And, in Wilson v. Dimitri, La. App. 4 Cir., 138 So.2d 618, the court said:
 "* * * As the trial judge pointed out in a well-considered opinion, our courts have applied the rule of reason to each case with the result that an aggressor is permitted to recover if he is injured through the use of excessive force applied to repel his attack." (138 So.2d 621).
In the instant suit, since the evidence establishes that Isadore used excessive and unnecessary force in repelling the attack by the defendant, and that plaintiff's son was killed as the result of the use of such unnecessary force, we think the trial judge correctly held that Isadore is responsible in damages to plaintiff for the death of his son.
The next question presented is whether Maryland Casualty Company is also solidarily liable to plaintiff for these damages.
At the time the shooting occurred, there was in effect a public liability insurance policy issued by Maryland Casualty Company tothe City of Lafayette, in which policy Maryland Casualty Company obligated itself to pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injuries, including death, sustained by any person and caused by accident. Among the hazards covered by the policy are the operations of "Policemen." Plaintiff contends that Isadore was a "Policeman" of the City of Lafayette at the time the shooting occurred, and thus that the public liability insurer of the City is liable under the policy for the damages resulting from the death of the decedent. Defendant Maryland, on the other hand, contends that Isadore was not a "Policeman" of the City and was not employed by it in any capacity, that the City of Lafayette could not be held responsible for his actions and that the policy issued by Maryland, therefore, provides no coverages for the damages sustained by plaintiff.
As we have already pointed out, at the time this incident occurred Isadore was employed by Thibeaux, the owner of the Gil Theater, to keep order in the theater. His salary for services rendered at the theater was paid entirely by Thibeaux. He was not an employee of the City of Lafayette, and he received no remuneration or compensation of any kind from the City. He had never been a member of, or an officer in, the Police Department of the City.
Sometime prior to the date on which this incident occurred the Chief of Police of the City of Lafayette had issued to Isadore a wallet-size card which reads as follows:
"CITY POLICE DEPARTMENT — Lafayette, Louisiana
 Name ALBERT ISIDORE -------------- Signature s/ Albert Isidore ------------------ HONORARY COMMISSION
 s/ Easton P. Dupre ------------------ Chief of Police"
Isadore testified that he was a "special officer" of the City of Lafayette, and Captain Howard J. Benoit, a Detective on the City Police Department, also considered him to be a special officer. Isadore states, however, that he had no authority to make an arrest, and that his instructions were to call the "City Police" in the event of a disturbance and the City Police would then come and would make any arrest which may *Page 355 
be necessary. No oath of office was administered to Isadore, and there is nothing to show that he was listed on the records of the Police Department as a "special officer" or in any other capacity. He purchased his own uniform and pistol, neither of these items being furnished by the City of Lafayette. He received no training of any kind from the City Police Department, and he received no instructions from that Department, other than being told to call the City Police in the event an arrest became necessary. We think the evidence shows that the Police Department exercised no supervision over his actions at the theater, although Isadore states that he thinks the police chief had control over his actions, that he checks with the police chief at times and that he "would follow his instructions."
We have been referred to no statute and no ordinance of the City of Lafayette which grants to the Chief of Police the authority to appoint a person to serve as a policeman or as a special officer for the City, and there is nothing in the record or arguments of counsel which shows what power or authority becomes vested in a person by the issuance of an Honorary Commission to him by the Chief of Police, such as the one which was issued to Isadore here. We assume that the governing authority of the City has never officially appointed or designated Isadore to serve as a policeman or as a "special officer," since the evidence fails to show that any such action was ever taken by the City.
The term "Policeman" has been defined as "a member of the police," and the word "police" has been described as "[a]n organized civil force for maintaining order, preventing and detecting crime, and enforcing the law; the body of men by which the municipal laws and regulations of a city, town, or district are enforced." Burke v. State, 76 Ga. App. 612, 47 S.E.2d 116.
In Black's Law Dictionary, Fourth Edition, "Police" is defined as "the function of that branch of the administrative machinery of government which is charged with the preservation of public order and tranquillity, the promotion of the public health, safety, and morals, and the prevention, detection, and punishment of crimes." And, a "Police Officer" is defined in that dictionary as "one of the staff of men employed in cities and towns to enforce the municipal police, i.e., the laws and ordinances for preserving the peace and good order of the community. Otherwise called `policeman.'"
In Green v. City of Bennettsville, 197 S.C. 313, 15 S.E.2d 334, the Supreme Court of South Carolina held that "the duties of a policeman are varied and one of the incidents of such duty is the arrest of individuals who violate the laws and ordinances of the municipality." In Parker v. Travelers' Ins. Co., 174 Ga. 525,163 S.E. 159, 81 A.L.R. 472, the Supreme Court of Georgia held that "a policeman is * * * a public officer whose duties relate to the governmental functions of a municipality, and for whose torts while exercising such functions the municipality is not liable." It also has been held that a policeman is the legal equivalent of the "watchman" at common law who possesses the power of arrest now vested in peace officers. Frank v. Wabash Railroad Company, Mo., 295 S.W.2d 16; Porter v. State, 124 Ga. 297, 52 S.E. 283; Harris v. Sevier, La. App. 1 Cir., 138 So. 459.
The terms "private policeman" and "special policeman" are defined in Corpus Juris Secundum, as follows:
 "Private policeman. One employed by a private corporation to police its own property, who is paid by the employing company, and who is clothed with power to make arrests, and subject to the control of the police department of the city government, is not a municipal officer.
 "Special policeman is a term used to designate one who is not a member of a permanent and organized police force, but who merely engages to do temporary police duty in a particular place or on a special occasion. It is the usual rule that special policemen are *Page 356 
public officers when performing their public duties, even though compensated by private employers." (62 C.J.S. Municipal Corporations, § 568, page 1091).
We think the term "Policeman," as that term is generally used and understood, means a person who is a member of an organized civil force for maintaining peace and order, preventing and detecting crime, and enforcing the law. A policeman of a city is a person who has been authorized and empowered by the city to perform duties which relate to its governmental function of maintaining peace and order. In this case, the City of Lafayette could not be held to be responsible for the actions of Isadore, even though his acts may have been designed to maintain peace and order, unless the City had authorized or empowered him to perform the duties usually performed by policemen or peace officers for the City, including the power to make arrests. See LSA-R.S. 15:58 et seq.
The evidence shows that Isadore was not and has never been a member of the Police Department of the City of Lafayette. He had received no authority from the City of Lafayette to make arrests or to perform any of the duties commonly performed by policemen or peace officers. Insofar as the City of Lafayette was concerned, he had no more authority to make arrests or to perform the duties of a peace officer than did any other private citizen or any other employee of the theater. His instructions were to call the "City Police" in the event a disturbance occurred or an arrest was necessary. Under these circumstances we agree with the trial judge that Isadore was not a "Policeman" for the City of Lafayette, and for that reason neither the City nor its public liability insurer can be held to be responsible for his actions which resulted in the death of Ambrose Tezeno.
Plaintiff relies on the cases of Musmeci v. American Automobile Insurance Company, La. App. 4 Cir., 146 So.2d 496 (Cert. denied), and Estrada v. Indemnity Insurance Company of North America,158 Cal.2d 129, 322 P.2d 294. In our opinion, however, neither of these cases is applicable here. In the Musmeci case the "special police officer" was employed by the Board of Levee Commissioners of the Orleans Levee District, and the only pertinent issue presented was whether the public liability insurer of the employer, the Levee Board, was liable for the actions of this employee. No issue was raised as to whether he was a member of the city police department or whether the city's insurer was liable for his actions. In the Estrada case the "police officer" was clearly employed by the city as a policeman, and the question most closely related to this case which was presented was whether his actions were covered by a policy insuring the "City of Kerman And Its Officials While Acting Within Their Capacity As Such." In the instant suit defendant Isadore was not an employee or a police officer of the City of Lafayette.
We agree with plaintiff that when a provision in an insurance policy is subject to more than one reasonable and equally logical interpretation, the interpretation which is most favorable to the insured should be adopted. See Floyd v. Pilot Life Insurance Company, La. App. 2 Cir., 135 So.2d 546; Keenan v. Wactor, La. App. 3 Cir., 130 So.2d 800; and Albritton v. Fireman's Fund Ins. Co.,224 La. 522, 70 So.2d 111. In this instance, however, we do not think that the policy insuring the City of Lafayette against liability can reasonably or logically be interpreted in such a manner as to provide coverage for the actions of defendant Isadore as an employee of the Gil Theater. In our opinion, therefore, the trial judge correctly dismissed the suit as to Maryland Casualty Company.
Plaintiff contends that the award of $5,000.00 made in this case is inadequate and should be increased. The evidence shows that plaintiff is 56 years of age, he apparently is able-bodied and he is engaged in farming for his living. He is married and has eight children living with him. The *Page 357 
decedent, who was 26 years of age at the time of his death, also was living with plaintiff. Plaintiff and one of his sons testified that for a period of time prior to his death the decedent gave plaintiff $25.00 each pay day, which we assume from the testimony occurred twice a month. During the time these payments were being made, however, plaintiff obviously was providing food and lodging for the decedent, and there is no indication in the record as to whether the payments made by the decedent covered or exceeded the expenses incurred by plaintiff in providing the necessities of life for his son. Under the facts and circumstances presented here we cannot say that the award made by the trial judge in this case was inadequate.
For the reasons herein set out the judgment of the trial court is affirmed. All costs of this appeal are assessed to plaintiff-appellant.
Affirmed.
JOINER v. LENEE, 213 So.2d 136 (1968) Ada Marie JOINER, Plaintiff-Appellant, v. A. L. LENEE et al., Defendants-Appellees. No. 2339. Court of Appeal of Louisiana, Third Circuit. July 26, 1968. Rehearing Denied August 20, 1968.
APPEAL FROM FIFTEENTH JUDICIAL DISTRICT COURT, PARISH OF VERMILION, CARROL L. SPELL, J. *Page 137 
J. Minos Simon, Lafayette, for plaintiff-appellant.
Davidson, Meaux, Onebane Donohoe, by J. J. Davidson, Jr., Lafayette, Thompson Sellers, by Charles Thompson, Jr., Abbeville, for defendants-appellees.
Before FRUGÉ, SAVOY and HOOD, JJ.
HOOD, Judge.
This is an action for damages arising out of the death of Johnny Joseph Johnson, who died as the result of a wound received when he was shot by Edward Landry. The suit was instituted by the decedent's widow, Ada Marie Joiner, individually and in behalf of her two minor children. The defendants are Landry, A. L. Lenee, City of Abbeville and Great American Insurance Company. Lenee is a former Chief of Police of the City of Abbeville, and Great American Insurance Company was the insurer of that city when the shooting occurred. In response to motions filed by three of the defendants, and after hearing, a summary judgment was rendered by the trial court dismissing the suit as to Lenee, City of Abbeville and Great American. Plaintiff has appealed.
Plaintiff contends that a genuine issue of material facts exists, and that the trial judge thus erred in rendering a summary judgment. Defendants contend that there is no genuine issue as to a material fact and that the judgment of dismissal should be affirmed.
Plaintiff alleges that at about 2:20 a.m. on November 16, 1964, the decedent was shot by defendant Landry shortly after the former entered a night club in Abbeville, Louisiana. She alleges that the shooting was "without provocation whatsoever," and that it was done by Landry "while acting or purporting to act under color of law and by virtue of his status as a police officer." She further avers that defendant Lenee was the Chief of Police of the City of Abbeville when the incident occurred, and that:
 "Previous to November 16, 1964, the said A. L. Lenee appointed and employed one Edward Landry as a city police officer for the City of Abbeville and at all times material hereto the said Ed Landry was acting or purporting to act under color of statute, ordinance, regulation, custom, and/or usage and in his capacity as a police officer."
Plaintiff propounded interrogatories to defendants Lenee and City of Abbeville, which interrogatories were answered. Plaintiff also took the deposition of Lenee.
On April 14, 1966, Lenee filed a motion for a summary judgment, praying that the suit be dismissed at plaintiff's costs. Annexed to and made a part of that motion were the pleadings, the interrogatories which had been propounded by plaintiffs and the answers thereto, the deposition of Lenee and four affidavits. On April 21, 1966, a similar motion for a summary judgment was filed by defendants City of Abbeville and Great American Insurance Company.
On April 25, 1966, or four days after the last mentioned motion for summary judgment had been filed, plaintiff filed a supplemental petition alleging, in substance, that for many years the police department of the City of Abbeville had encouraged the *Page 138 
employment of peace officers by private citizens in places of public amusement, that the city police department recommended Landry for that type of employment and provided him with a police badge and uniform, that the city police department authorized Landry to wear and make discretionary use of side arms and held him up to the general public as a police officer of the city, and that at the time of this shooting Landry thus was a "de jure and/or de facto" officer of the city. Alternatively, plaintiff alleges that defendants are estopped from denying that Landry was a de jure or de facto peace officer or that he was acting for the City of Abbeville at the time the shooting occurred.
A hearing was held on the motion for summary judgment, and at that hearing the movers filed in evidence the above described interrogatories and answers, the deposition of Lenee and the four affidavits which were attached to one of said motions. Plaintiff filed no affidavits and she presented no evidence of any kind at that hearing. After the trial, the trial judge concluded that the affidavits and deposition "negate any employment of Edward Landry by the City or Lenee," and a summary judgment thus was rendered dismissing the suit insofar as it was directed against the defendants Lenee, City of Abbeville and Great American Insurance Company.
The receivable evidence which was introduced at the hearing shows that Landry was employed as a part-time policeman by the City of Abbeville from February 16 to August 28, 1962, and that his employment was terminated on the last mentioned date, which was more than two years before the decedent was shot. Landry has not been employed by the city at any time since that date, and he thus was not employed by the city or by Lenee on November 16, 1964, when the shooting which precipitated this suit occurred. Police officers in the City of Abbeville, including part-time officers, are and have been employed only by resolution adopted by the Mayor and City Council. The Chief of Police has never employed and has never been vested with authority to employ any such officer.
The owner of the nightclub in which this incident took place stated, by affidavit, that Landry was working for him as a "bouncer" when the shooting occurred, that he paid Landry for his work, that the latter was under the direct supervision of the affiant, that no one else exercised any supervision or authority over Landry at that club, and that Landry was not under the supervision or control of the City of Abbeville or of any officer or employee of that city. The statements of the owner of the nightclub were verified by an affidavit of another employee who was working as a "bouncer" in the same club.
Lenee testified by deposition that Landry has not been employed by the City of Abbeville at any time since his original employment was terminated on August 28, 1962, and that since that time Landry has never been authorized to carry side arms or to make arrests. He stated that when Landry's employment by the city was terminated in 1962, he allowed Landry to keep "some old clothes and a cap" and "an old badge," and that Landry was wearing the badge and the cap when the shooting occurred. With reference to the clothes, the cap and the badge, Lenee explained, "Well, I give him all of that. I didn't take it away from him. When he use it again, he just went and used it. But, I didn't tell him to use that. He just used it." "Well, I didn't know he was using them even."
Lenee stated that the owner of the nightclub called him before hiring Landry and asked if it was all right for Landry to be his bouncer, and that Lenee thereupon told him "it was all right with me if it's all right with you * * * he could take anybody for bouncer as far as that." Lenee acknowledges that he knew that bouncers in nightclubs, including Landry, carried pistols while working in this capacity, although they have no legal authority to do so, but he stated that "they do that all over the country." He stated that prior *Page 139 
to the time the incident involved here occurred, while Landry was working as a bouncer at another nightclub, Lenee informed him that he could not make arrests, and that all he could do was to hold the offender under civilian arrest "until my boys get there."
As we have already noted, plaintiff filed no counter-affidavits and submitted no evidence of any kind to rebut the statements contained in the affidavits, deposition and answers to interrogatories which had been offered in evidence by defendants.
The summary judgment remedy is not a substitute for a trial, and a summary judgment may not be rendered when there is a genuine issue of a material fact which must be resolved. The burden of proof rests on the party seeking a summary judgment to show that there is no genuine issue as to material fact and that the mover is entitled to judgment as a matter of law. All doubts are to be resolved against the granting of a summary judgment and in favor of a trial on the merits to resolve the disputed facts. Kay v. Carter, 243 La. 1095, 150 So.2d 27
(1963); Roy Roy v. Riddle, 187 So.2d 492 (La.App. 3d Cir. 1966); Henderson v. Falgout, 188 So.2d 208 (La.App. 1st Cir. 1966).
If the mover at the trial of a motion for summary judgment produces convincing proof, by affidavits or other receivable evidence, of the facts upon which the motion is based, and no counter-affidavits or other receivable evidence are offered by the opposing party to contradict that proof, then a conclusion may be justified that there is no genuine issue as to the facts so proved, even though allegations to the contrary might be contained in the pleadings. LSA-C.C.P. arts. 966 and 967; Duplechain v. Houston Fire Casualty Insurance Company,155 So.2d 459 (La.App. 3d Cir. 1963); Touchet v. Firemen's Insurance Company of Newark, New Jersey, 146 So.2d 441
(La.App. 3d Cir. 1962, cert. denied); Goodart v. Maryland Casualty Company, 139 So.2d 567 (La.App. 4th Cir. 1962); Dowden v. Hartford Accident Indemnity Company, 151 So.2d 697 (La.App. 3d Cir. 1963); Roy Roy v. Riddle, supra; Henderson v. Falgout, supra; Rushing v. Weyerhaeuser Company, 144 So.2d 420
(La.App. 4th Cir. 1962); Johnson v. Combined Insurance Company of America, 158 So.2d 63 (La.App. 1st Cir. 1963).
LSA-C.C.P. art. 967, as amended by Act 36 of 1966, provides that:
 "When a motion for summary judgment is made and supported as provided above, an adverse party may not rest on the mere allegations or denials of his pleading, but his response by affidavits or as otherwise provided above, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be rendered against him."
A comment appearing under LSA-C.C.P. art. 966, after that article and the succeeding one were amended in 1966, reads in part:
 "The amendments of these two articles were adopted to: (1) permit the trial judge to consider answers to interrogatories when deciding the motion for summary judgment; and (2) require the adverse party against whom a motion for summary judgment had been taken to file counter-affidavits, and not permit him to rely on the bare allegations of his pleading."
The receivable evidence which was presented at the hearing in the instant suit shows that Landry was not employed by the City of Abbeville or by defendant Lenee at the time the shooting occurred. He received no remuneration from the city, and neither the city nor any official or employee of that city exercised any authority or control over his actions at that time. The pistol which was used in the shooting was not furnished by the city or by Lenee, and Landry was never authorized by the city or by its Chief of Police to wear or to use side arms at any time after his employment *Page 140 
by the city had been terminated in 1962. At the time the shooting occurred Landry was employed by the owner of the nightclub where he worked, he received his salary solely from that employer and in performing the duties of his employment he was subject solely to the authority and control of the owner of that club.
The evidence also shows that at the time the shooting occurred Landry was wearing a policeman's cap and a policeman's badge of the type used by policemen in the City of Abbeville, and he was carrying a pistol. The Chief of Police of that city had allowed Landry to keep the cap and the badge, as well as two old policeman's uniforms, when his employment as a part-time policeman had been terminated two years earlier. Although Landry was not specifically authorized to use the cap and the badge, he had not been expressly prohibited from doing so. We assume, for the purposes of this motion, that defendant Lenee was aware of the fact that Landry was working as a bouncer in various nightclubs in Abbeville, that he at least occasionally wore the policeman's uniform and badge which he had been allowed to keep, and that he also occasionally carried a pistol while so employed.
We conclude that all of the above stated facts have been established, and that there is no genuine issue as to any of those facts. In arriving at that conclusion, we have considered the circumstance that plaintiff has not filed any counter-affidavits or presented any evidence to contradict the facts proved by defendants. We also note that the allegations in plaintiff's supplemental petition that Landry was acting as agent for the City of Abbeville and that he was a de jure and de facto peace officer of the city at the time of the shooting are conclusions of law, rather than allegations of fact.
The next question presented is whether under these established facts, about which there is no genuine issue, the movers are entitled to the summary judgment which they seek.
The case of Tezeno v. Maryland Casualty Company,166 So.2d 251 (La.App. 3rd Cir. 1964), involved facts which were similar to those presented here. In that case Albert Isadore, the person who did the shooting, was employed by the owner of a theater in the City of Lafayette to keep order in and around that building. He was wearing a policeman's uniform and he carried a loaded pistol in a holster at his side when the shooting occurred. The uniform and pistol had been purchased by him. Isadore was not employed by the City of Lafayette and he had never been a member of the city police department. He, however, had been issued an "Honorary Commission" by the Chief of Police of the City of Lafayette, and he had a card certifying to that effect on his person at the time of the shooting. Under those circumstances, we held that Isadore was not a policeman for the City of Lafayette, and that the city thus was not responsible for his actions which resulted in the death of plaintiff's son.
Plaintiff argues that the Tezeno case is distinguishable from the instant suit, because "there was nothing outwardly identifying Isadore as a member of the City Police Department of Lafayette," whereas in this case the Chief of Police of the City of Abbeville had furnished Landry with a uniform, a cap and a badge which labeled him as a member of the city police department. It is argued that Lenee knew that Landry wore this uniform and badge and that he carried a gun while working at the nightclub, and that he took no steps to prevent Landry's from doing so. Landry, plaintiff contends, was impersonating a city policeman to the knowledge of the Chief of Police, and the city and its insurer thus are liable for the actions of Landry in shooting the decedent.
We are unable to distinguish the Tezeno case from the instant suit. There, Isadore was wearing a policeman's uniform, he carried a gun and he had in his possession a card signed by the Chief of Police certifying that an "Honorary Commission" had been issued to him. In this suit, Landry *Page 141 
was wearing a policeman's cap, he was carrying a gun and he wore a policeman's badge. In each case the person who did the shooting was employed by the owner of a private business, he was not employed by the city and the city exercised no authority or control over him. We think the rule which was applied in the Tezeno case should be applied here.
In our opinion the fact that the Chief of Police, Lenee, allowed Landry to keep his old uniforms and a badge, and that he knew that Landry was wearing the uniform and badge and carried a gun at times while working as a bouncer in nightclubs, are not sufficient to make Landry a de facto officer of the city. We agree with the trial judge, therefore, that plaintiff may not recover from Lenee, or from the City of Abbeville or its insurer.
Plaintiff argues further that defendants are estopped from denying that Landry was a de jure or de facto policeman. She contends that the city robed Landry with all of the paraphernalia necessary to identify him as a member of the police department, and that "because Landry was so robed, petitioner's husband did not resist or defend himself."
The pleadings filed by plaintiff do not indicate that the decedent was misled in any way by Landry's cap and badge. But even if he was misled and for that reason did not defend himself, the unquestioned facts show that it was not the fault of the City of Abbeville or the Chief of Police. The fact that the Chief of Police allowed Landry to keep his old uniforms and policeman's badge two years earlier does not render the city liable for Landry's actions here. And, the failure of the Chief of Police to prevent Landry from carrying a gun also does not render the city liable for his actions in using that gun. To hold otherwise would compel a holding that the city would be liable in every case where it fails to prevent a citizen from illegally carrying a gun which inflicts injury on someone else.
Our conclusion is that defendants are not estopped from denying that Landry was a de jure or de facto police officer at the time this shooting occurred.
For the reasons herein assigned, the judgment appealed from is affirmed. The costs of this appeal are assessed to plaintiff-appellant.
Affirmed.
On Application for Rehearing.
En Banc. Rehearing denied.